484 P.2d 636

**DELTA CORPORATION OF AMERICA,**
a Florida corporation, Appellant,

v.

**WESTERN COACH CORPORATION, an**
Arizona corporation, Appellee.

**No. I CA–CIV 1471.**

Court of Appeals of Arizona,
Division 1,
Department B.

May 11, 1971.

**· 484**

Machmer & Schlosser by Gerald A. Machmer, Phoenix, for appellant.

Henry Jacobowitz, Phoenix, for appellee.

JACOBSON, Presiding Judge.

This case requires a determination as to whether a dealer in mobile homes is entitled to a "participation" in an agreement between a bank and its mobile home contract servicing agent.

Plaintiff-appellee, Western Coach Corporation, an Arizona corporation, brought an action against defendant-appellant, Delta Corporation of America, a Florida corporation, seeking to enforce an agreement to pay Western five percent of certain proceeds arising out of a transaction whereby the Colorado National Bank of Denver obtained a "portfolio" of mobile home purchase contracts from an organization known as Service Trust Company. Judgment was entered by the trial court, sitting without a jury, in Western's favor in the sum of $14,090.55. Delta appeals from that judgment.

Prior to May 1, 1965, Western was engaged in the State of Arizona as a retail seller of mobile homes, which retail sales business generated numerous conditional sale purchase contracts and promissory notes secured by chattel mortgages. Delta is a corporation which is engaged in the business of servicing mobile home purchase contracts for various participating banks. This "servicing" business consists of handling customer complaints, collection under contracts, repossessions, and such other services as are necessary to see that the particular bank which was financing a mobile home received its money. To this end, Delta also guaranteed the payment to the bank of the amount of its loan. For this service, Delta received a fee from the bank. As part of its servicing agreements with its various participating banks, Delta entered into agreements with these mobile home retail dealers that allowed financing of a particular mobile home sale to be placed with a bank having a service agreement with Delta. Dealers having such an agreement with Delta are known as "participating dealers."

On May 1, 1965, Western became a "participating dealer" with Delta and an agreement was entered into between them which provided:

> "You [Western] will receive from us [Delta] on each contract approved by our participating bank, a bonus equivalent to five percent of the gross charges (gross charges mean the sum total of the finance charges plus the insurance premium charges)."

This agreement was signed by the field representative of Delta, Donald H. Roll, and was countersigned by the president of Delta, Gilbert Haas.

Following execution of this agreement, Mr. Max Morgan, President of Western, learned that Service Trust Company, a Texas corporation, had a "portfolio" of approximately two million dollars in mobile home contracts originating in Arizona and California which it wanted to sell. Mr. Morgan then contacted Mr. Roll of Delta to determine whether Delta might be interested in placing this portfolio with one of its participating banks. Upon receiving a favorable reply to this inquiry, Mr. Morgan and Mr. Roll travelled to California where Mr. Morgan introduced Mr.

Roll to Mr. Joe Robichaux, an officer of Service Trust Company. As a result of this meeting, Delta was successful in placing $1,377,536.67 in mobile home contracts with its participating bank, Colorado National Bank of Denver. Delta received from Colorado National Bank for this service, the sum of $27,800.00. Colorado National Bank realized a profit on the transaction in the sum of $299,593.56.

Western contends that it was agreed between Mr. Morgan and Delta's field representative, Mr. Roll, that Western was entitled to its usual five percent of the gross charges in placing this portfolio with Delta. Delta on the other hand contends that no such agreement existed, and if it existed, that it was made by an agent without authority, and if made with authority, Western should be entitled to only five percent of the fee Delta received rather than five percent of the profit made by the Colorado National Bank which was the figure utilized by the trial court.

Taking the evidence in a light most favorable to sustaining the judgment of the trial court, we have little difficulty in finding that the trial court, based on the testimony of Mr. Morgan, could have determined that Mr. Roll on behalf of Delta agreed to pay Western five percent of the gross charges arising out of the placing of the Service Trust Company mobile home paper. This brings us to the basic question raised by Delta, that is, the authority of Mr. Roll to bind Delta to such an agreement. It appears from the evidence that Mr. Roll was the highest employee of Delta within the states of Arizona and California. As field representative for Delta, he had authority to solicit banks and dealerships and to place mobile home paper with a participating bank.

Delta's business was the placing of mobile home paper with participating banks. Moreover, there is evidentiary support for the view that the business relationship between Western and Delta with regard to the Service Trust transaction, only differed from their normal relationship in the respect that Western was on this occasion placing contracts generated by the sales of another dealer rather than itself. There is no question that at the time of the agreement between Western and Roll concerning the Service Trust Company transaction, Delta would have been liable to Western for five percent of the gross charges on Western's mobile home paper placed with a participating bank. Further there is no question that the mobile home paper that Western brought to Delta's attention, was subsequently placed by Delta with a bank which had a participating agreement with Delta.

■ Normally, where an agent has power to perform a particular service, he also has power to do whatever is necessary and usual to carry out the principal power. Carrel v. Lux, 101 Ariz. 430, 420 P.2d 564 (1966). In this case, the trial court could have found that Mr. Roll was merely performing his usual service for Delta, that is obtaining mobile home contracts through one of Delta's participating dealers, Western, and therefore had authority to assure that dealer he would receive his usual bonus. Moreover, a corporation which entrusts a local agent with its business affairs is bound by that agent's contracts necessarily made in the ordinary prosecution of that business. Dover Copper Min. Co. v. Doenges, 40 Ariz. 349, 12 P.2d 288 (1932). Under the facts in this case, we find there is sufficient evidence to justify the trial court's determination that the act of Mr. Roll in affirming a five percent participation by Western in the Service Trust contracts, was binding upon Delta. See Bud Antel, Inc. v. Gregory, 7 Ariz. App. 291, 438 P.2d 438 (1968).

This then brings us to the last contention made by Delta, that is that the judgment entered against it should be based upon five percent of what it received from the transaction rather than what its participating bank received. A review of the evidence does not support this contention. In this case a specific interrogatory was ad-

**486**

dressed to Delta and answered by its president. The interrogatory was:

"9. What was the amount of the 'gross charges' (meaning the sum total of the finance charges, plus the insurance premium charges) under the Contracts acquired by defendant as part of the Service Trust Company portfolio?"

The answer given was:

"9. The gross charges were $298,011.-55."

Mr. Michael F. Ellis, Sr., Executive Vice-President of Delta, whose deposition was introduced into evidence, testified:

"Q. Now, under your participating agreement that you had in effect in 1965, if I read one of them correctly, I believe under the participating agreement you paid the dealer in question a five percent participation fee; is that right?

"A. On the individual contracts that are originated through a lending— through a given lending institution, right.

"Q. And I believe it's five percent of the 'gross charges' whatever that may be?

"A. Correct.

"Q. And gross charges I believe, means that the sum total of finance charges plus the insurance premium charges?

"A. That is correct.

"Q. Now, with respect to this Service Trust Company, was there such a payment made to a participating dealer?

"A. No.

"Q. Can you tell me, sir, the face value of the contracts which were part of this portfolio?

"A. The face value of the contracts were $1,355,593.85."

\* \* \* \* \* \*

"Q. What were the finance charges of these contracts at that time?

"A. $298.011.55."

 Under this state of the evidence, the trial court could have correctly determined that Western's five percent bonus was to be based upon the $298,000.00 figure.

The judgment of the trial court is affirmed.

HAIRE and EUBANK, JJ., concur.